AMERICAN BOARD OF COM'RS OF FOREIGN MISSIONS *v.* FERRY, Ex'r, etc.*

(*Circuit Court, W. D. Michigan.* April, 1883.)

1. WILLS—TESTATOR MAY DESIGNATE AN UMPIRE TO CONSTRUE HIS WILL—WHEN SUCH UMPIRE'S DECISION FINAL.

A testator may in his will designate his executor an umpire, and invest him with power to construe his will and determine every doubtful question that may arise touching the testator's intentions; and if such umpire exercises the power honestly and in good faith, his decisions will not be revised by a court, notwithstanding the court may think the same are erroneous.

2. SAME—COURTS OF EQUITY WILL INTERFERE—WHEN.

But if the umpire refuses to act, transcends his authority, makes an incomplete award, or commits some gross mistake or error of judgment evincing partiality, corruption, or prejudice, or violates some statutory requirement on which the dissatisfied party had a right to rely, a court of equity may interfere and correct the error, and, in proper cases, restrain further abuse of such power.

3. INTEREST—WHEN IT WILL NOT DISQUALIFY AN UMPIRE.

Such an umpire, interested in the residuum, that may be increased or diminished by his decisions, is not disqualified to act, provided the contingency in which he acts was foreseen and understood by the testator when he conferred the power.

4. WILLS—PECULIAR BEQUEST CONSTRUED.

The testator by will, after providing for the payment of his debts, certain legacies, and expenses of administration, declared that he supposed there would be a large balance remaining, out of which he directed his executor, "in *pro rata* distribution, to pay over to the appropriate medium of the following bodies the indefinite sum of letter A, the maximum of which shall be $30,000, to-wit: To the American Board of Commissioners of Foreign Missions, the *pro rata* of letter A ; to the American Bible Society, the like *pro rata* of letter A ; to the American Tract Society of Boston, the *pro rata* of one-half of letter A; and to the Presbyterian Publication Committee, the like *pro rata* of letter A. Should the indefinite amount prove to be adequate to the whole payment, from $30,000 down to $15,000, then the whole is to be paid; otherwise, each is to receive their definite proportion, but in no case to exceed the *pro rata* of the full amount of the letter A." *Held*, that the maximum amount of said bequest was $30,000, and that of said sum the first two bodies named should receive one-third part each, and the other two one-sixth part each

*C. T. Walker,* for complainant.

*Hughes, O'Brien & Smiley,* for defendants.

BAXTER, J. William M. Ferry, late of Ottaway county, Michigan, died in the latter part of 1867. He left a last will and testament, in which, after disposing of a large part of his estate, and appointing the defendant his "male executor," he provided as follows:

"*Eighth.* After defraying my funeral expenses, the services of executors, and all debts, if any there be, I presume there will be remaining a large bal-

*Reported by J. C. Harper, Esq., of the Cincinnati bar.

ance over and above all bequests already made, of which my executor, as soon as he shall be able to convert real estate into money or available funds, shall, in *pro rata* distribution, pay over to the appropriate medium of the following bodies the indefinite sum of letter A, the maximum of which shall be thirty thousand dollars, to-wit: To the American Board of Commissioners of Foreign Missions, the *pro rata* of letter A; to the American Bible Society, the like *pro rata* of letter A; to the American Tract Society of Boston, the *pro rata* of one-half of letter A; and to the Presbyterian Publication Committee, the like *pro rata* of letter A. Should the indefinite amount prove to be adequate to the whole payment from thirty thousand down to fifteen thousand dollars, then the whole is to be paid, otherwise each is to receive their definite proportion, but in no case to exceed the *pro rata* of the full amount of the letter A. It is further presumed there will remain, after the foregoing provision, a residue or balance unprovided for, hence,—

"*Ninth.* I give, devise, and bequeath all the rest, residue, and remainder of my estate, or the avails thereof, to my six children, viz.: To my three daughters, Amanda Harwood, Hannah Elizabeth, and Mary Luccia, each, one-twelfth part, share and share alike, and the balance to my three sons, William Montague, Thomas White, and Edward Payson (defendant herein) one-third part each, share and share alike. * * *"

"*Twelfth.* Be it distinctly understood by all concerned that every word and sentence herein is strictly my own; and I hereby determine and direct, furthermore, that in case any doubt or uncertainty arise touching any matter or thing contained or supposed to be contained in the foregoing, he, the existing male executor, shall act as umpire, and his determination and decision over his signature attached to this will, shall, in all respects, be accepted as final."

On the seventh of September, 1867, the testator appended a codicil in these words:

"Whereas, I, William M. Ferry, did in writing, over my signature, make my last will and testament, bearing date the twenty-third day of February, A. D. 1867, in which I constituted Edward P. Ferry, or his successor therein designated, as my male executor, and also did authorize him to construe and determine any matter or thing which might be doubtful, or in any manner needful, pertaining to said will. * * * In a word, my desire and design in respect to every person, matter, or thing wherein there may be supposed the least uncertainty or doubt, my male executor shall use his judgment, in accordance with my supposed purpose, and determine and decide every matter just as he may think was my intention, thereby making final and conclusive, under his hand, every possible uncertainty."

The defendant accepted the trust imposed on him by said will, and duly qualified as executor thereof, and made and attached the following declaration in writing, under his hand and seal thereto, to-wit:

"*State of Michigan, County of Ottaway:* In the matter of the last will and testament of William M. Ferry, deceased. In this matter the American Board of Commissioners of Foreign Missions, the American Bible Society, the Ameri-

can Tract Society of Boston, and the Presbyterian Publication Committee, having made, through their agents and attorneys, a claim, under the eighth bequest or subdivision of said will, in substance, that said societies or bodies were entitled to receive from the executor of said William M. Ferry's estate, and from said estate, a sum total of $90,000, and that the indefinite sum of letter A, mentioned in said bequest, represented the sum of $90,000, if there should be that sum remaining of the estate after paying the legacies therein before mentioned; and it being claimed on the other hand that the said indefinite sum of letter A, is, at the most, only the sum of $30,000. And, whereas, in and by said will and testament, and particularly in and by the twelfth subdivision thereof, and the codicil annexed thereto, it is provided that in case any doubt or uncertainty arise touching any matter or thing contained, or supposed to be contained, in said will and testament, the executor therein named, Edward P. Ferry, shall act as umpire, and his determination and decision over his signature attached to said will, shall be in all respects final.

"Therefore, in consideration of the premises, and inasmuch as doubts have arisen by reason of said claim among the parties, concerning the true construction of said will, and said bequests contained in the eighth subdivision, by virtue of the power contained in said will and codicil, I, the executor therein named, do hereby determine and decide that the true construction of said instrument, and the true intent and meaning of said testator, was that the said indefinite sum represented by said letter A, named in said will, is at the utmost and under any circumstances only the sum of $30,000, and that the said sum of $30,000, if said estate should amount to so much after paying said sums before that therein mentioned, should be divided between the said bodies named, in the following manner and proportion, viz.: To the American Board of Commissioners of Foreign Missions, and to the American Bible Society, each one-third of said indefinite sum; and to the American Tract Society of Boston, and to the Presbyterian Publication Committee, each one-sixth of said indefinite sum of letter A, but in all not exceeding $30,000."

The complainant seeks, upon the foregoing and other formal allegations made in connection therewith, a construction of the foregoing several clauses of said will, and insists that the construction thereof made by the defendant and hereinbefore copied, was and is unauthorized; that the conclusion reached is erroneous; and that it is entitled thereunder to the sum of $30,000, provided there are funds enough subject to the legacy to pay the same. To all which the defendent interposes a general demurrer, and upon argument contends—*First*, that defendant's construction of said eighth clause is an authortative, final, and conclusive determination of the questions; and, *second*, that under said eighth clause of said will, the maximum of letter A is $30,000, and that the complainant is only entitled to one-third part of that sum, subject to the contingency therein stated.

The testator had the legal right to dispose of his property by will. The paper executed by him for that purpose has been duly probated,

and is his last will and testament; it assumes to dispose of his estate. The language is not in every part a clear and definite expression of his intentions; on the contrary it is in some particulars involved and even repugnant. He seems himself to have been conscious of this infirmity of the paper, and therefore constituted the defendant an umpire, and clothed him with authority in case "any doubt or uncertainty" arose "touching any matter or thing contained or supposed to be contained" therein, to "determine the same," declaring that in the execution of said power the defendant might "use his judgment in accordance with" the testator's "supposed purpose, and determine and decide every matter just as he may think" the testator intended it to be understood and construed, and thereby make the same "final and conclusive," and remove "every possible uncertainty." Are these clauses valid? May a testator thus designate and provide an umpire and clothe him with the power of interpreting his meaning and determining every doubtful question that may arise touching his intentions in regard to the disposition made of his estate?

No adjudication has been cited by the counsel interested expressly affirming the validity or declaring such testamentary provision contrary to positive law or in contravention of public policy. "A man," says Lord Chancellor SUGDEN, "may devise an estate under any conditions provided it is not an illegal one;" and it is believed he may in like manner bequeath personalty subject to such limitations and restrictions not forbidden by law or in conflict with public policy, as he may choose to prescribe. Is the designation of an executor as an umpire with authority to construe and execute the will an illegal or an unreasonable power? Similar provisions are frequently found in building and other contracts, stipulating that the parties will abide the judgment and award of an architect, engineer, or other arbiter upon all doubtful questions that may arise in relation to the construction or execution of the contract, and these have been generally, if not uniformly, sustained and enforced by the courts, in all cases where the power conferred was exercised fairly and in good faith. If parties, dealing with each other at arm's length, may thus agree upon an arbiter and covenant to abide his decision upon all questions arising out of such contracts, may not a person authorized to dispose of his property by will, in like manner designate an umpire in whose judgment, friendship, and integrity he reposes confidence, and clothe him with authority to interpret his testament and declare its meaning? Such provisions do not vest such umpires with authority to ignore the testator's intentions as expressed in the will, and substi-

tute his own wishes. "Clauses of this description," says MARSHALL, C. J., in *Pray* v. *Belt*, 1 Pet. 679–80, "have always received such judicial construction as would comport with the reasonable intention of the testator.".

The real object in such inquiries is to ascertain the testator's intentions, but does not include the power of altering or making another and different will. Such an umpire could not, under the pretense of exercising such power, refuse to pay the legacies clearly bequeathed, or pay to A. a legacy bequeathed to B., or otherwise depart from the plain and obvious meaning of the will. Such gross departure from the manifest intention of the testator would be considered by the courts as evidence of a fraudulent exercise of the power conferred. In other words, an umpire, however plenary his authority, must act in good faith in the execution of his powers. When they thus act their decisions are to be received and treated with respect. The rule, as we conceive it, is, when an arbiter honestly and in good faith exercises his power and passes upon a doubtful question, either of law or of fact, his decision will not be revised by a court, notwithstanding the court, whose interposition is invoked, may think his decision erroneous. As a rule the courts will not interpose to correct a mere mistake in the judgment of an arbitrator. But if the arbitrator refuses to act, awards upon a matter not submitted, makes an incomplete determination, or commits a gross mistake or error of judgment, evincing partiality, corruption, or prejudice, transcends his authority or violates some statutory requirement on which the dissatisfied party had a right to rely, or commit some other like error, courts of equity may interfere and correct the error, and, in proper cases, and upon good cause shown, restrain all further abuse of the granted powers.

But there are no such allegations in this case. The power conferred by the will, if valid, authorized the award made; its ambiguity called for construction. · The decision made, if erroneous, is not so manifestly wrong as to evince prejudice, partiality, or corruption. Defendant's integrity is not impugned, and his determination of the question passed on ought not to be disturbed unless something else appears which is sufficient in the view of a court of equity to vitiate his action. The record discloses the fact that the defendant is one of the residuary legatees, and that as such legatee he would, in case there is a residuum for distribution, be entitled to an undivided sixth part thereof; that his construction of the eighth clause of the will sought to be revised by this proceeding tends to swell the residuum and increase his interest therein; and it is insisted that this direct

personal pecuniary interest in the fund to be distributed is a legal disqualification to his acting as an umpire in the matter. There is a maxim, long approved, which excludes persons from sitting in judgment in their own cases. The reasons for and the limitations of this legal maxim need not be stated here. It is enough to say that it has never been understood as an inhibition upon the rights of individuals to select their own tribunals provided they do so with a full knowledge of all the facts, for the adjustment and determination of such controversies as they may choose to submit to their arbitrament. MARSHALL, C. J., said in the case of *Pray* v. *Belt, supra,* that if "an unreasonable use be made" by interested parties of such a power, "one not foreseen," and hence "not intended by the testator," it was the duty of the courts, "under their general powers," to interpose and preserve the rights of parties. Certainly. But the court did not adjudge that an interested party could not, under any circumstances, act as an umpire. The decision is that he cannot do so in an *unforeseen contingency* not within the scope of the testator's intentions.

But that question is not involved in this case. Here the facts were clearly understood by the testator. He knew that the defendant was one of his residuary legatees, and that his decision in almost every contingency that could possibly arise, would, in a greater or less degree, increase or diminish the residuum in which he was to be interested. And yet, with full knowledge of this important fact, he designated defendant as an umpire and invested him with plenary authority to interpret his testamentary wishes, as expressed in his will, and administer his large estate. Has complainant, which had no inherent claim upon the testator's bounty, been wronged thereby? The testator had the legal right to give or not to give, and giving, he had the right to bestow his bounties on such conditions, and with such limitations and restrictions as he chose to impose; to select the agents to execute his declared intentions, and to invest them with such powers and discretion, not forbidden by positive law or in conflict with public policy, as he chose to confer, subject, of course, to such legal and equitable supervision to the extent and within the limits heretofore defined, as the parties interested, might, from time to time, invoke in their behalf. Why then, could he not designate the defendant, a son in whom he had confidence, to exercise the extraordinary powers given by the will? It may be that the testator desired that all doubts in reference to his intentions should be solved in favor of his own family. Of this, however, we know nothing. But we do know that he made the designation and conferred the

power with a full knowledge of defendant's contingent interest in the fund to be administered; and defendant's construction thereof, made pursuant to the power conferred, is entitled to the same consideration, respect, and legal force, as if made by an umpire having no interest therein.

But we need not rest the decision alone on this ground. The construction of said eighth clause by the defendant is, we think, a correct exposition of the testator's intentions. We agree with complainant's solicitor in the declaration that it is susceptible of but one of two constructions: *First*, that the testator intended to give not exceeding $30,000 to each of the two first, and not exceeding $15,000 to each of the other two legatees named; or that he intended to give not exceeding $30,000 to them all, to be apportioned between them as therein directed. But the question still remains, did he intend to bequeath $30,000, or $90,000? The amount given is the "indefinite sum of letter A." But why describe it as an *indefinite sum?* Because the testator had previously bequeathed other large legacies which were to be paid before the legacies given by the eighth clause; and his estate consisting mainly of unimproved lands of uncertain value, he could not anticipate results, and therefore gave, in the event the assets turned out to be sufficient, the indefinite sum of letter A, but he was careful to add that the maximum thereof should be $30,000. Upon this point the testator's intentions have been well expressed. It is, after this plain and explicit declaration, and when he assumes to apportion the aggregate sum among the several legatees to whom it is given, that the redundant and unintelligible language commented on by counsel is encountered. We will not attempt to reconcile the verbiage employed, or clear up the obscurity complained of, further than to say that it is incapable of any interpretation which can, by any recognized canon of construction, enlarge the amount bequeathed. On the contrary the ascertained intention of the testator to limit the amount bequeathed by said clause, is a key to unlock the obscurity that follows. When the maximum of the bequest is ascertained and definitely fixed, the subsequent involved and unintelligible language must be made to harmonize with that which precedes and which is susceptible of a clear and definite construction. If we will do this all uncertainty as to the testator's intentions will disappear. Of the $30,000, the maximum of the sum bequeathed, the complainant is entitled to one-third, the American Bible Society to another third, and the American Tract Society and the Presbyterian Publication Committee each to a sixth part thereof; and it will be so declared.